# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 0 2 2026

TAMMY H. DOWNS, CLERK

By:_____ DEP CLERK

| | | |
|---|---|---|
| R.V. and C.V., Parents and Next Friends of N.V., A Minor,<br><br>Plaintiffs<br><br>v.<br><br>CONWAY SCHOOL DISTRICT; JEFF COLLUM, former Superintendent of the Conway School District ("CSD"); SHANDA NEW, former Principal Marguerite Vann Elementary School; MATT COATNEY, Assistant Principal Marguerite Vann; KELLI GORDON, Director of Special Education CSD; and TINA GILBERT, Special Education Supervisor CSD,<br><br>Defendants | § § § § § § § § § § § § § § § § § § § § § § § | CASE NO.<br><br>4:26CV0001-LPR |

## COMPLAINT

Plaintiffs, R.V. and C.V., Individually and as Parents and Next Friends

of N.V., a minor, for their Complaint state:

This case assigned to District Judge *Rudofsky*
and to Magistrate Judge *Volpe*

## I. **INTRODUCTION**

1.    R.V. and C.V. ("Parents") are the Parents of N.V., a child with a disability as defined by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, *et seq.*

2.    N.V. has a rare chromosome abnormality, 14q11.2 deletion, de nova, pathogenic, 1.8 Mb. Her condition is associated with macrocephaly, possible seizures, intellectual disability and possible autism. This is a lifelong condition for N.V. who requires very close monitoring by multiple medical providers, particularly neurology, developmental services and pediatrics.

3.    At all times pertinent hereto N.V. suffered severe physical and emotional injuries as a result of Defendants' deliberate indifference and creation of a dangerous environment that placed N.V. at a significant risk of serious, immediate, and proximate harm.

4.    At all times following N.V.'s injuries that occurred on January 5, 2023, Defendants, R.V. and C.V. suffered severe emotional harm.

## II. PARTIES

5.    The Conway School District ("CSD") is an Arkansas School District and a public corporation that may be sued in its own name. Ark. Code Ann. §6-13-102(a). Arkansas school districts are *not* state agencies immune from suit pursuant to the Eleventh Amendment. *Herts v. Smith*, 345 F.3d 581, 588 (8th Cir. 2003).

6.    Jeff Collum was the Superintendent of CSD at all times relevant to Plaintiffs' Complaint. Collum was terminated as CSD's Superintendent on or about July 1, 2025.

7.    Shanda New was the Principal of CDS's Marguerite Vann Elementary School at all times relevant to Plaintiffs' Complaint. New is currently employed by CSD as the Director of Programs and Accountability.

8.    Matt Coatney is and was at all times relevant to Plaintiffs' Complaint the Assistant Principal of CDS's Marguerite Vann Elementary School.

3

9.    Kelli Gordon is and was at all time's relevant to Plaintiffs' Complaint CSD's Director of Special Education.

10.    Tina Gilbert is and was at all times relevant to Plaintiffs' Complaint was CSD's Special Education Supervisor for CDC elementary schools.

## III.  JURISDICTION AND VENUE

11.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331 and §1343(a)(3).

12.    This Court is the proper venue. *See* 28 U.S.C. §1391(b). Plaintiffs reside in Faulkner County, Arkansas. The CSD's principle place of business is in Faulkner County, Arkansas. The events giving rise to this Complaint occurred in Faulkner County, Arkansas. Faulkner County is in the Eastern District of Arkansas, Central Division. *See* 28 U.S.C. §83(a)(1).

## IV.  STATEMENT OF FACTS

13.    Beginning with the 2022-2023 school year, N.V., a 6 year old, 1st grade, non-verbal, autistic, "medically fragile" Student was

4

assigned to a "multi-grade self contained" special education classroom at Marguerite Vann Elementary School in the CSD.

14.   Whitney Burns had been hired as the teacher for N.V.'s classroom. Burns held a Master's degree in Education and later returned to graduate school to obtain her license in Special Education.  She had over 15 years of experience in education, including 8 years working in self-contained classrooms with students who had special needs - which she felt was her true calling. Burns had been teaching at another school district and the 2022-23 school year was her first year teaching in the CSD.  **T1; p.16**

15.   Burns described N.V. as "'absolutely precious' with piercing eyes that made it feel like she was looking into your soul." **T1; p.25** N.V. was nonverbal and communicated through smiling, crying, and whining, similar to an infant. **T1; p.39** She was very inquisitive, unsteady on her feet, and had poor balance, often falling. **T1; p.25** N.V. was interested in everything around her and liked to wander around the room when not in her "activity" chair. **T1; p.27**

16.    N.V.'s classroom consisted of ten "multi-grade" students, with two paraprofessionals assigned to assist the teacher. **T1; p.46** The students ranged in age from kindergarten to fourth grade, with varying disabilities and needs. **T1; p.181** Specifically, there were: 2 or 3 fourth graders (described as "big boys" who were adult-sized); 4 or 5 kindergartners (all boys); 1 first grader (N.V.); 1 second grader (a girl); In total, there were 10 students in the classroom, with 8 boys and 2 girls. **T1; p.20-2**1

17.    Seven of the ten students were nonverbal, eight were autistic, and all had intellectual impairments. **T1; p.23** Three students had feeding tubes, and four were not potty-trained, requiring personal care minutes for diapering. **T1; p.22**

18.    The classroom was referred to as "chaotic," with frequent behavioral issues, including aggression from some students.  The teacher noted that the environment was challenging due to the lack of adequate support and resources, which made it difficult to focus on education and meet the students' needs effectively.  **T1; p.166**

19.    According to N.V.'s teacher, there was a significant size difference between N.V. and some of the other children. She described N.V. as "small and medically fragile, with unsteady balance and limited mobility." In contrast, two or three of the boys in the classroom were fourth graders who were described as "big boys" and "adult-sized," weighing around 150 pounds each. **T1; p.21** This size disparity raised safety concerns, as N.V was vulnerable to being hurt by the larger, more aggressive children in the classroom.  **T1; p.27**

20.    Burns identified "JQ", a fourth-grade student in her self-contained classroom, as the main student who had injured other students. She described JQ as a large, adult-sized fourth grader with significant behavioral issues, including aggression. Burns stated that JQ had previously injured two paraprofessionals, causing neck injuries that required surgery. She also mentioned JQ had hit her personally multiple times, starting two weeks into the school year, and that his behavior escalated over time. **T1; p21, p.72**

21. N.V. was born with several medical issues, including a chromosome deletion 14q11.2, that caused developmental disabilities, intellectual impairment, and physical challenges such as poor balance, coordination, and low muscle tone (hypotonia). N.V. was fully dependent on others for her personal care needs, including toileting and feeding.

22. During first grade, N.V. wore a diaper, and the school nurse, a female, and the paras were responsible for changing N.V.'s diaper as needed and documenting her care.

23. A "portable" wheelchair (aka "safety chair") with a table and lap belt had been obtained for N.V. in Preschool and had been passed along to kindergarten and then 1st grade.

24. The Parents - who were primarily Spanish speaking - had no knowledge that N.V. spent the majority of her day buckled into the portable wheelchair in order to keep her safe from other students. The use of the chair was not specified or authorized by N.V.'s IEP.

25.    Indeed, N.V. needed as much practice walking as possible to improve her balance and coordination. Nevertheless, she was only taken out of the "safety chair" for activities, such as floor-based tasks or to go to recess. According to her teacher, N.V. "spent too much time in the chair because it was the safest option in the chaotic classroom environment." **T1; p.51**

26.    N.V. received little to no educational benefit from her placement in the 1st grade self-contained 1-10 classroom. Burns estimated that she spent about *10 minutes per week with N.V. one-on-one at her table.* She explained the chaotic classroom environment, frequent behavioral outbursts from other students, and the need to manage safety concerns made it difficult to dedicate more individual time to N.V. and expressed frustration that she couldn't spend more quality one-on-one time with N.V. due to the lack of adequate support and resources in the classroom. **T1; p.218; 171**

27.    Burns stated that other students in the classroom hit or pushed N.V. - but they worked hard to prevent such incidents and would intervene to protect N.V. - often placing her in her portable wheelchair "to keep her

9

safe." Burns mentioned that N.V. was inquisitive and would sometimes approach other students or try to take their belongings when out of the chair, which could lead to her being hit or pushed. During the first semester of 1st grade - N.V. came home numerous times with bruises over her body. The District did not provide any information to the Parents about N.V.'s day or daily care needs, or about what had caused the bruises she often came home with.

28. On one occasion in the Fall of 2022, the Parent went to the school to pickup N.V. for a doctor's appointment and when she pulled into the school parking lot she saw N.V. standing outside along the fence alone. When the Parent went up to talk to N.V. someone came out and removed N.V. and ignored what the Parent was saying in Spanish. When the Parent inquired and picked up N.V. in the office, the Parent was told that N.V. was simply "out at recess," although no other children could be seen on the playground.

29. On October 10, 2022, N.V. came home with a huge knot on her forehead when arriving off the special needs bus. The Parents, who do

not speak English, were not told anything about how N.V. received the huge bump on her forehead.

30.     The Parents could only speak Spanish and only way provided to the Parents and staff to communicate with each other was to call a designated interpreter, Grace Smith, who took the information and relayed it between school personnel and the Parents. There were no notes, texts, or email messages kept by Smith memorializing any communications made to or from the Parents or District. It was discovered after the January 5th Injury that Smith - at least on January 9, 2023 - failed to pass along accurate translation of an important message from the Parents to the District.

31.     On October 10, 2022, the Parent asked to speak with the school nurse about the bump on N.V.'s forehead and according to the interpreter - was told the nurse said "there was nothing to worry about." When N.V. was taken to the ER and continued to have blood clots coming from her nose, the doctor told the Parents that he would send the nurse a letter.

32.    The nurse's concern expressed to these Parents about N.V.'s head injury at school mirrors the District's deliberate indifference to N.V.'s needs and well being - as well as services that were provided.

33.    For example, despite N.V. being non-verbal - the District made no effort to provide her any type of communication device and/or to teach her any type of communication skills.

34.    Despite N.V. needing a one-on-one aid to assist in her daily needs, the District provided no one and instead her "safety chair" was used to keep N.V. out of harms way.

35.    The multi-grade self-contained special education classroom to which N.V. was assigned in 1st grade - was incorrectly classified by CSD as a 1:10 Classroom (one teacher to ten disabled students).  All ten students in N.V. self-contained classroom were high needs disabled students of varying ages, including students with severe behavioral issues. According to the Arkansas Department of Education ("ADE") Special Education Programming standards, the standard of care for self-contained classrooms with high needs

students is 1:6 (one teacher to six disabled students), including one full time paraprofessional.[1]

36.     Due to inadequate staff, N.V.'s self-contained classroom was total chaos. CSD failed to provide N.V. a Free Appropriate Public Education ("FAPE") as required by the IDEA.

37.     Parents filed a Due Process Complaint with the Arkansas Department of Education on August 25, 2023, pursuant to the IDEA to remedy the denial of a FAPE.  On June 22, 2024, an impartial due process hearing officer ("HO") issued a final decision and order in favor Parents.

38.     A true and correct (redacted) copy of the HO's final decision and order is attached hereto was **Exhibit A** and incorporated herein by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

---

[1] *See*, ADE Programming Regulation §17.03, CHART # 2-17.

39.    The evidence at the due process hearing established that N.V.'s self-contained classroom was a state-created danger due to the conscience shocking deliberate indifference of Defendants.

40.    Defendants had a clearly established duty to protect N.V. because it placed N.V. in a position of danger that N.V. would *not* otherwise have faced. *See Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) ("We have held the Due Process Clause imposes a duty on state actors to protect or care for citizens . . . when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.").

41.    N.V.'s self-contained classroom teacher was Whitney Burns. Burns was an experienced special education teacher, but this was her first year working for the CSD and first year at Marguerite Vann Elementary School.

42.    Burns testified at the due process hearing that the standard of care for a self-contained classroom like hers was 1:6 (one teacher to six disabled students), including one full-time paraprofessional.[2]

43.    Defendants knew that a 1:6 teacher-student ratio was the standard of care required by the Arkansas Department of Education ("ADE"), but were deliberately indifferent to the significant risk of serious, immediate, and proximate harm to N.V.

44.    According to ADE Regulations, exceeding the specified teacher/pupil caseload would result in a district's special education program being unapproved and disqualified for federal funds.[3]

45.    Burns tried to make the 1:10 student-teacher ratio work, but by the end of September, it was clear to her that N.V. and her other

_____

[2] ADE Programming Regulation §17.03 states: "For a self-contained classroom with multiple autistic non-verbal students ranging from kindergarten to 4th grade, the teacher-to-student ratio is 1:6. Additionally, a full-time paraprofessional is required to assist in the classroom.***" ***This ratio ensures adequate support for students with extensive needs, such as autism and non-verbal communication challenges.

[3] See ADE Programming Regulation §17.03.3.4 which states: If a district fails to secure approval for a variance of the teacher/pupil caseload, yet exceeds the teacher/pupil caseload as stated on the Maximum Teacher/Pupil Caseload Chart contained in this document, the district's special education program will not be considered an approved program. Consequently, federal funds cannot be generated by the nonapproved program.

students were *not* safe due to the risk of and actual incidents of student-on-student violence.

46.    Moreover, there was another self-contained special education classroom next to Burns's classroom. The special education teacher in that classroom, Morgan Williams, also reported that her students were *not* safe because of the risk of and actual incidents of student-on-student violence.

47.    In early October, Burns and Williams emailed their school principal, Shanda New, and reported that their students were not safe because of the risk of and actual incidents of student-on-student violence.

48.    Principal New was deliberately indifferent to the safety of the disabled students in the classrooms of Burns and Williams. To Burns' knowledge, New took no action in response to the email.

49.    However, Burns believes that the CSD administration (Collum, Gordon, and Gilbert) became aware of concerns about the special education classrooms at Marguerite Vann Elementary School

because a schedule change was made so that the two self contained classes were suddenly divided and began attending "activity classes" (PE, Art, Music, Library, Computer) separately.

50.    Because the change in activity classes did not address the safety concerns raised by Burns and Williams, Burns forwarded an email to Gordon and Gilbert at the end of October 2022.

51.    Collum, Gordon, and Gilbert were deliberately indifferent to the safety needs of the disabled students in the classrooms of Burns and Williams. To Burns knowledge, Collum, Gordon, and Gilbert never took action to address the safety concerns raised by Burns and Williams.

52.    Upon information and belief, CSD had a custom of maintaining a 1:10 student-teacher ratio in self-contained classrooms despite the needs of disabled students and despite the standard of care specified by the ADE requiring a 1:6 teacher-student ratio.

53.    Collum, Gordon, and Gilbert enforced this custom and refused to reduce the teacher-student ratio at Marguerite Vann Elementary

17

School. To meet the standard of care, CSD needed *at least* one additional self-contained special education classroom, and thus, CSD needed to hire one additional special education teacher and one full-time paraprofessional.

54.    Rather than hire needed personnel, Collum, Gordon, and Gilbert decided to place N.V. and other disabled students at significant risk of serious, immediate, and proximate harm from student-on-student violence.

55.    After Burns forwarded the email to Gordon and Gilbert, New called Burns into her office and reprimanded her for going outside the "chain of command" and told Burns to "stay in her lane."

56.    According to Burns, New also told her that the administration (Collum, Gordan, and Gilbert) would likely retaliate by providing Marguerite Vann Elementary School *less* resources because Burns had spoken out on behalf of her students. **T1; p.18**

18

57. After the meeting with New, Burns stated "the idea that my students would not get resources because I advocated for them made me sick." **T1; p.18**

58. On December 4, 2022, Burns drafted a resignation letter that stated, in part:

The reason for my resignation is solely due to the structure of my 1:10 special education classroom. Please understand, I have 8 years of experience working with this population of students. I was not given these students against my will. These are the students I choose to work with. Currently, there are 10 high-need students in my classroom. My students have medical issues like seizures, chromosomal disorders, and heart defects. They have personal care needs like diapering, feeding tubes, and swallowing issues that require care and attention. They have cognitive levels well below typical, sensory and emotional issues that cause unpredictable outbursts, and behavioral issues that cause aggression towards staff and other students. Ten students on this level is a huge safety concern. Three staff members cannot keep these ten students safe. Just this school year, we have had students punching, hitting, and kicking staff and other students. One student consistently elopes and there are several times he has made it out of the building before we could catch him. One medically fragile student has been hit and thrown to the ground by another student. Another student uses curse words and offensive language every day-so much that other students have started using those words as well. My students struggle with simple routines like walking in the hallway and using the food service line in the cafeteria. My students in diapers are not being potty trained. My students'

inappropriate behaviors are often ignored. This is all due to lack of staff. There are not enough staff members to adequately meet the students' needs consistently. I will also add that there are currently two staff members who have suffered neck injuries due to the misbehavior of my students. Additionally, there is another 1:10 classroom next door to mine that is facing the same struggles.

We do our best every day to meet each child's physical and safety needs but rarely get to work on any educational needs. This is a very stressful environment for everyone involved. My experience tells me that it does not have to be like this. These students deserve and have a legal right to an education and it can be done when the student/teacher ratio is lower. The stress of this situation is taking a toll on my mental health and the lack of education for my students is taking a toll on my conscience. I cannot continue to take responsibility for this situation.

59.    The "medically fragile student . . . hit and thrown to the ground by another student" was N.V. In fact, Burns reported that N.V. was hurt at school multiple times.

60.    Burns initially informed New, she intended to resign the last day of December and not to return in January 2023.  However, after being told by CSD's HR director that resigning mid-year would result in an ethics violation and could cost Burns her teaching license - she

stayed until a new teacher was employed.  February 7, 2023, was Burns last day with CSD. .

61.    When school resumed after Christmas Break an incident occurred on January 5, 2023, that resulted in N.V. being injured and unable to return to school for the remainder of the 2022-2023 school year.

62.    Burns described the events of January 5th as follows: Her classroom was chaotic and unsafe that morning primarily due to the behavior of JQ, who was disruptive from the start of the day, refusing to come to class, yelling, climbing on furniture, and throwing chairs. During circle time, JQ threw a chair across the room, narrowly missing other students sitting on the carpet. **T1; p.121**This incident was the breaking point for Burns who decided to take sick leave for the remainder of the day, stating she could no longer handle the situation. **T1: p.170**  Before leaving, Burns instructed Jalen Thomas, a paraprofessional, to take JQ to the assistant principal's office. During this process, JQ hit, kicked, and verbally abused Burns,

calling her derogatory names. Burns left the school shortly after this incident, around 8:30 a.m.

63.    Burns notified the administration that she was leaving — telling the assistant principal, Mr. Coatney, and the school nurse, Mandy Townsend, about her decision to leave due to the chaotic situation in the classroom. Nurse Mandy was in Burns' classroom at the time she left. **T1; p.121**

64.    Both Burns and Coatney notified New - who was in a meeting away from the school - that Burns had left for the remainder of the day.  There was no attempt made to obtain a substitute teacher for the classroom and instead - Jalen Thomas, a paraprofessional with no experience or training who had worked there for 2 months, was left in charge of Burn's classroom.

65.    Despite there being no teacher in Burns' classroom, Assistant Principal Matt Coatney returned JQ to the classroom with Thomas.

66.    Coatney was deliberately indifferent to the risk posed by JQ, already in an agitated state, to N.V. and the other disabled students the classroom and failed to get a substitute teacher in the classroom.

67.    Coatney's decision to return JQ the understaffed classroom placed N.V. and the other disabled students at significant risk of serious, immediate, and proximate harm from student-on-student violence. As a result, N.V. was kicked and hit several times by JQ and sustained bruising to her thighs and vaginal area.

68.    By the time N.V. got off the school bus that day, her Mother immediately- noticed she was "suffering a lot" and was "crying, overwhelmed, and in pain, with bruising on her legs and private parts." The Mother attempted to reach the District's interpreter to find out what had happened to N.V. at school, but was unable to reach anyone or leave a message.

69.    When N.V. could not be consoled - her Parents took her to Arkansas Children's Hospital ("ACH") where they gave permission for N.V. to undergo testing for sexual abuse.

70. The Parents spent all night at ACH for N.V. to be tested and treated and did not leave until 1:00 pm January 6th. ACH doctors told N.V.'s Parents they believed she had been sexually abused and not to return N.V. to school.

71. After all tests were completed, ACH reported N.V.'s injuries could have been due to a direct blow from a kick - a form of blunt trauma - that Thomas testified with what he saw on the playground between N.V. and JQ.

72. N.V.'s mother sent a text message to Grace Smith, the school interpreter, on January 9, 2023. In the message, she informed the school that "N.V. had come home "super bad" from school on January 5, had been taken to the emergency room twice since then, and was still feeling bad, in pain, overwhelmed, crying, and very scared." **T5; p.124** Smith failed to translate the text as sent by the Parent, instead communicating to the school: "FYI from mom: She wanted to let the school know N.V. has been feeling under the weather since 1-5.  They have been to the ER two times since

Thursday. She is home but not feeling well and currently resting." **T5; p.118**

73. When Burns returned to the classroom she was told by Thomas that JQ had hit and kicked N.V. during recess. Thomas told Burns he was unsure how many times JQ had hit or kicked N.V. Burns expressed anger and frustration upon learning that N.V. had been hurt and questioned why JQ was allowed to remain at school while N.V. did not return.

74. There was no teacher in the classroom or on the playground at the time that N.V. was allegedly attacked by JQ, and *Thomas was the only witness to the attack on N.V.* Thomas never reported the attack to anyone, and N.V. was *not* taken to the nurse. At the due process hearing, Thomas testified that JQ attacked N.V. and kicked her "in the lower leg."

75. When N.V. arrived home from school on January 5, 2023, Parents observed that she appeared to be in pain, and upon

inspection, Parents saw bruising on N.V.'s inner thigh, crotch, and private parts, and believed she had been sexually assaulted.

76.    Parents took N.V. to Arkansas Children's Hospital ("ACH") where she was examined. ACH doctors initially told Parents that it appeared N.V. had been sexually assaulted. Whether or not N.V. was sexually assaulted, ACH confirmed a "vaginal injury" and bruising on her right knee and left surface of the pubic bone.

77.    Investigations of the incident by the Arkansas State Police, Conway Police Department, and Department of Human Services concluded that N.V.'s injuries were caused by another student, J., that attacked N.V. on January 5, 2023.

78.    It was not until February 2, 2023, that New informed Parents that, according to Thomas, N.V. was attacked by JQ on January 5, 2023.

79.    Upon information and belief, the CSD administration (Collum, Gordon, and Gilbert) enforced the 1:10 teacher-student ratio throughout CSD and refused to reduce the teacher-student ratio in

all self-contained special education classrooms despite the needs of disabled students and despite the standard of care being a 1:6 teacher-student ratio.

80.    Upon information and belief, the CSD administration's (Collum, Gordon, and Gilbert) decision to maintain the custom of a 1:10 teacher-student ratio placed all CSD's disabled students at significant risk of serious, immediate, and proximate harm from student-on-student violence.

81.    Upon information and belief, the CSD Board of Directors had actual knowledge that the CSD administration was maintaining a 1:10 teacher student ratio that placed all CSD's disabled students at significant risk of serious, immediate, and proximate harm from student-on-student violence.

82.    Upon information and belief, the CSD Board of Directors had actual knowledge that the CSD administration had a custom of failing to receive, investigate, and act upon complaints of student-

on-student violence, and in particular, violence perpetuated by disabled students on other disabled students.

83.    Upon information and belief, the CSD Board of Directors was on notice that its procedures were inadequate and likely to cause a constitutional violation. Moreover, notice may be implied because the failure to receive, investigate, and act upon complaints of student-on-student violence was so likely to result in a constitutional violation that the need for additional personnel was patently obvious.

84.    As described above, there was a continuing, widespread, and persistent pattern of unconstitutional misconduct by CSD's employees in failing to receive, investigate, and act upon complaints of student-on-student violence, and in particular, violence perpetuated by disabled students on other disabled students.

85.    CSD's Board of Directors were deliberately indifferent and/or tacitly authorized such misconduct by CSD's employees in failing to receive, investigate, and act upon complaints of student-on-student

violence, and in particular, violence perpetuated by disabled students on other disabled students.

### Count I – Due Process – State-Created Danger

86.    Plaintiffs seek compensatory and punitive damages pursuant to 42 U.S.C. §1983 for Defendants' violations of N.V.'s constitutional right to substantive due process protected by the 14th and 5th Amendments to the U.S. Constitution.

87.    The Defendants, acting under color of state law, violated N.V.'s constitutional right to substantive due process by their conscience shocking deliberate indifference to the obvious and known risk of harm to N.V.

88.    N.V. was a member of a limited and precisely defined group, namely Burns' multi-grade self contained special education classroom at Marguerite Vann Elementary School during the 2022-2023 school year.

89.    Defendants' conduct put N.V. at significant risk of serious, immediate, and proximate harm.

90. The risk was obvious and known to Defendants.

91. Defendants acted recklessly in conscious disregard of the risk.

92. In total, Defendants conduct shocks the conscience.

93. As a direct and proximate result of Defendants' violation of N.V.'s constitutional right to substantive due process, Parents and N.V. have incurred and will incur in the future pecuniary and non-pecuniary losses for which they should be compensated.

94. Parents and N.V. have incurred and will incur in the future medical bills, lost earnings, and caretaking expenses.

95. Parents and N.V. have suffered non-pecuniary losses in the form of past and future emotional pain, suffering, inconvenience, mental anguish, loss of dignity, and loss of enjoyment of life.

96. Parents respectfully request compensatory damages for Parents' and N.V.'s pecuniary and non-pecuniary losses in an amount determined by a jury.

97. Defendants' conduct in this case was motivated by evil motive or intent and/or involved reckless or callous indifference to the

federally protected rights of Parents and N.V., and accordingly,

Parents and N.V. should be awarded punitive damages to punish

them and to deter others from engaging in similar behavior.

## Jury Demand

98.    Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs pray that they awarded compensatory

damages for their pecuniary and non-pecuniary losses and punitive

damages in an amount determined by a jury; that they be awarded their

costs and attorneys' fees expended herein; and, that they be awarded all

other just and proper relief to which they may be entitled.

Respectfully submitted,

Theresa L. Caldwell

Arkansas Bar Number 91163

Attorney for Plaintiffs

**CALDWELL LAW OFFICE**

14 Alban Lane

Little Rock, Arkansas 72223

Tel.: 501-414-0434

31

E-mail: tlcatty@gmail.com

**ARKANSAS DEPARTMENT OF EDUCATION
SPECIAL EDUCATION UNIT**

████████████ ███████,

**AS PARENTS OF**

████ ████████,

Petitioner/Parents

VS.                                                NO. H-24-11

**CONWAY SCHOOL DISTRICT,**
                    Respondent/District

## HEARING OFFICER'S FINAL DECISION AND ORDER

████ ███████ ("Student") is a child with a learning disability who is eligible for special education services from the Conway School District ("District"). On August 28, 2023, Student's parents Consuelo and Ruben █████████ (hereinafter referred to as "Parents" or singly as "Father" or "Mother" where appropriate), filed a request for a due process hearing pursuant to the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 et seq. ("IDEA") alleging that District failed to comply with the IDEA, its implementing regulations, and regulations of the Arkansas Department of Education, Special Education Division ("Department"), thereby denying Student a free and appropriate education ("FAPE") under the IDEA.

**I.
ISSUES PRESENTED**

1. Whether District denied Student a FAPE in violation of the IDEA during the 2021-2022 and 2022-2023 school years;

2. Whether Student's IEP for the 2023-2024 school year is necessary and appropriate and will provide Student a FAPE; and

H-24-11
Page 1 of 21

3. Whether Compass Academy is an appropriate placement for Student, and if so, whether District should pay the tuition, fees, costs, and transportation for Student to attend Compass Academy.

## II.
## NON-JUSTICIABLE ISSUES

Parents also allege that District's conduct constitutes disability discrimination in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165. Additionally, Parents assert a claim of racial/national origin discrimination in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000d. This Hearing Officer has no jurisdiction over these federal claims. Accordingly, to the extent Parents' due process complaint raises disability discrimination claims and racial/national origin discrimination claims, those claims are DISMISSED WITHOUT PREJUDICE.

## III.
## PROCEDURAL HISTORY

On August 28, 2023, the Arkansas Department of Education (hereinafter referred to as "Department") received from Parents a request to initiate due process hearing procedures. Parents requested the hearing because they believed that District failed to comply with the IDEA, as well as regulations set forth by the Department, by failing to provide Student with an appropriate IEP and services, and as a result "has been injured, traumatized, and suffered regression." Complaint, p. 3. In its Response, District generally denied Parents' allegations that District denied Student a FAPE and affirmatively stated that it has complied with the IDEA, state rules, and federal implementing regulations.

In response to Parents' request for a due process hearing, the Department assigned the case to the undersigned impartial Hearing Officer. After scheduling the hearing, three continuances were granted for good cause, and a four-day hearing was scheduled to begin on January 23, 2024. Parents requested and were granted a live translator for the hearing as Parents do not speak English.

Having been given jurisdiction and authority to conduct the hearing pursuant to the IDEA, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Cheryl L. Reinhart, J.D., Hearing Officer for the Department, conducted a closed impartial hearing. Present for the hearing were Parents, represented by Ms. Theresa Caldwell, of Caldwell Law Office, Little Rock, Arkansas, and Kelli Gordon, District Special Education Director, represented by Ms. Shastady Wagner, Chief Legal Counsel for District. Ms. Audra Alumbaugh was present as an advocate for Parents. Mr. Nicholas Durand, Certified Interpreter and Translator for Parents, was present throughout the hearing.

The hearing was held over seven days: January 23-26, 2024, March 1, 2024, March 4, 2024, and April 30, 2024. In addition to Parents and Gordon, the following witnesses testified in this matter: Whitney Burns, former teacher, Marguerite Vann Elementary School, Conway School District; Shanda New, Principal, Marguerite Vann Elementary School; Jalen Thomas, paraprofessional, Marguerite Vann Elementary School; Matthew Coatney, Assistant Principal, Marguerite Vann Elementary School; Amanda Townsend, nurse, Marguerite Vann Elementary School; Elizabeth Hart, physical therapist, Marguerite Vann Elementary School; Aimee Cloud, speech therapist, Marguerite Vann Elementary School; Meredith Moix, speech therapist, Marguerite Vann Elementary School; Stephanie Tibbs, occupational therapist, Marguerite Vann Elementary School; Grace Smith, interpreter, Marguerite Vann Elementary School; Sgt. Brittani

Little, Conway Police Department; Dr. Jeff Collum, Superintendent, Conway School District; Courtney Williams, Director, Compass Academy; and Sgt. Dan Worley, Conway Police Department, School Resource Officer for Marguerite Vann Elementary School. *See, generally,* Transcript Vols. I-VII.

The parties requested to provide post-hearing briefs in lieu of closing arguments. The deadline for providing briefs was May 27, 2024, and briefs were filed on that day.

# IV.
# FINDINGS OF FACT

**Background:**

At the time the due process complaint was filed in this case, Student was seven years of age, and assigned to Ellen Smith Elementary School, Conway School District as a second-grade student. Student is currently enrolled at Compass Academy, but at all times relevant to this proceeding, was a student at Marguerite Vann Elementary School, Conway School District.

Student and her family – Parents and one older sister – entered the U.S. on a political asylum from El Salvador in 2019. Tr. Vol. V, p. 150. Student's home language is Spanish. Tr. Vol. V, p. 167. Her full name is ████████████████. *See* Parent Exh., p. 254. Exhibits and witnesses at times refer to Student's and Mother's surnames "████" and "███████"

Student was diagnosed at approximately age 4 with 14q11.2 microdeletion syndrome. Dist. Exh. 6, p. 9. While still living in El Salvador, Student received physical, speech/language, occupational, sensory, and feeding therapies. Parent Exh., p. 210. When Student first enrolled in District as a pre-K student, District conducted a comprehensive psychological evaluation to determine Student's eligibility for special education. Parent Exh., p. 208. Student was also evaluated for physical therapy (Dist. Exh. 4) and occupational therapy (Dist. Exh. 3).

The comprehensive psychological evaluation, conducted on April 9, 2021, concluded that Student was eligible for special education and related services under the disability category of Multiple Disabilities. Id., p. 216. The report notes Student's medical diagnoses as Corpus Collosum Agenesis, Chromosome Deletion 14q11.2, Developmental Delay, Seizure Disorder, and Oropharyngeal Dysphagia, "which cause delays in communication, cognition, motor, and orthopedic functions." Id., pp. 216-217. Testing results were as follows:

- **Developmental Profile 4 Teacher Checklist and Spanish Parent/Caregiver Interview (DP-4).** Student was rated on the teacher and parent checklists as being in the lower extreme of every category – physical, adaptive behavior, social-emotional, cognitive, and communication – with a General Development Score of <40. Parent Exh., pp. 212-213.
- **Adaptive Behavior Assessment System – Third Edition (ABAS-3) Teacher and Parent Ratings** – Student was rated on all domains by parent and teacher as lower extreme. Parent Exh., pp. 215-216.
- **Primary Test of Nonverbal Intelligence (PTONI)** – This test was attempted and discontinued. Parent Exh., p. 212.
- **Bracken School Readiness Assessment, Third Edition** – This test was attempted and discontinued. Id.

The report further notes that Student's cognitive abilities were rated in the sub average range of intellectual function, with deficits in all areas of adaptive behavior, that she will require close supervision at all times, and that these deficits will adversely affect educational performance in all academic areas, adaptive behavior, and functional skills. Parent Exh., p. 216. Student is seen regularly by her personal care physician and a team of physicians and specialists at Arkansas Children's Hospital including her Complex Care Pediatrician and specialists in neurology, audiology, dental, ophthalmology, speech therapy, psychology, physical medicine and rehabilitation, dietary, and genetics. Parent Exh., p. 218. Today, she is still primarily nonverbal and medically fragile.

## A. 2021-2022 School Year (August 28, 2021, to June 30, 2022) – Kindergarten

The statutory timeline for this proceeding begins on August 28, 2021, when Student was enrolled in kindergarten at Marguerite Vann Elementary School ("Vann"). Student's initial IEP, dated 8/16/21 to 5/26/22, provided the following special education and related services programming:

- Assigned to a 1:10 self-contained special education classroom;
- 100 minutes five days per week direct instruction in literacy;
- 55 minutes five days per week direction instruction in each of math, fine motor/writing, daily living, and adapted behavior;
- 210 minutes per month each of speech therapy, occupational therapy, and physical therapy;
- 120 minutes five days per week of personal care; and
- 2 sessions per day, five days a week of transportation support.

Parent Exh., pp. 90-136. The IEP notes that Student "is fully dependent on others for her personal care (feeding, toileting, hygiene, grooming) and will be provided personal care in the special class setting by [the teacher and two] paraprofessionals." Id., p. 92. Student required the daily use of items from home to assist or support her at school -- a special "activity" chair for feeding and support, and a helmet that she wore outside. Parent Exh., p. 92. On student's IEP dated May 5, 2022, the IEP team notes that Student "[e]xpresses some wants and needs through simple gestures or vocalizations other than crying," and "[u]nderstands one or more simple signals presented tactually." Parent Exh., p. 5.

Student's attendance at school is frequently interrupted by medical appointments that are required due to her complex medical condition. Parent Exh., p. 41. District argues, however, that, despite missing sixty-two (62) days of school in kindergarten, Student made progress on all of

her goals in kindergarten and mastered some. District Post-Hearing Brief, p. 11; *See* Dist. Exh. 8, pp. 17-32.

### B.  2022-2023 School Year (July 1, 2022, to June 30, 2023) – First Grade

Student's IEP Annual Review was conducted on May 5, 2022 (IEP dated 8/21/22 to 5/30/23). Parent Exh., pp.1-30. The IEP team also met on September 29, 2022 (Parent Exh., p. 35), and again on December 7, 2022, to review the results of Student's speech reevaluation (Parent Exh., p. 42). The IEP was amended to provide only 120 minutes per month of speech therapy services. There is no explanation either in the IEP or by the speech therapist as to why Student's speech therapy services were placed in the IEP at 120 minutes per month as opposed to the 180-210 minutes recommended by the speech therapist, discussed below, and the 210 minutes Student previously received. Parent Exh., p. 45-46; Tr. Vol. III, p. 191.

On November 8, 2022, Aimee Cloud, MS CCC-SLP, Speech-Language Pathologist for District, produced a report of her speech/language reevaluation of Student. Parent Exh., p. 265. The report states that Student's expressive language and receptive language skills are severely delayed, and recommends 180 to 210 minutes per month of speech-language therapy. Parent Exh., p. 269. In particular, the report identifies the following results of the evaluation:

- Receptive Language: [Student] is unable to understand basic concepts, comprehend words and attention commands …unable to identify objects … inconsistently responds to her name when it is called.
- Expressive Language: [Student] is a nonverbal communicator. Her quality of self-expression must be inferred through cries, gestures such as pushing something away or vocalizations of pleasure and displeasure.
- Pragmatic/Social Language: She is unable to initiate conversation, answer questions, and initiate topics. Id.

Parents assert that Student's IEP written for the first grade, dated 8/21/22 to 5/01/23, carries over the same goals as the previous IEP for kindergarten, and fails to address Student's need to learn a communication system. Parents Post-Hearing Brief, p. 5. The goals are not identical, however. For example, Student mastered objective 1 for her speech-language goal, so that was not included in the first grade IEP. On other goals, Student progressed but did not master them; those were updated to increase the progress percentages. Parent Exh., pp. 99-115. Student's physical, speech, and occupational therapists all testified that Student did make some progress, even the speech therapist who had Student for only four months. Tr. Vol. III, pp. 153 (Hart), 217 (Cloud), 229 (Moix).

Parents argue that none of Student's IEPs addressed Student's communication needs and specifically failed to address the use of assistive technology device. Parents Post-Hearing Brief, p. 6. Student's first grade speech therapist Cloud testified (and Parents counsel agreed) that there was a lot of work to do with Student before she was ready for an assistive technology device. Tr. Vol. III, p. 166. The kindergarten speech therapist also testified that sign language or an AAC device would have required Student to have more foundational skills, "pre-linguistic skills," than she had. Tr. Vol. III, p. 239. Compass Academy Director testified that she was not ready Vol. VI, p. 47.

## Self-contained Classroom Environment

Student was placed in a self-contained classroom which was staffed with one licensed special education teacher and two paraprofessionals for ten special education students. Student's first grade special education teacher, Ms. Burns, testified that of the ten students, two were girls (Student in first grade and the other in second grade), and eight were boys, three of whom were fourth grade level and "adult-sized," and five who were kindergarteners. Tr. Vol. I, pp. 21-24.

Seven of the ten students were nonverbal, eight were autistic, and all were intellectually impaired. Id. Three were on feeding tubes and four were not potty-trained. Id. Three students had "behavior problems," and JQ, the boy who hit and kicked Student, had a behavior plan. Id., p. 31.

Burns testified that before becoming employed at District, she had fifteen years in education, eight of those in self-contained special education classrooms. Tr. Vol. I, pp. 16-17. The first time in her career that she had ten students in a self-contained classroom was at District. Other districts kept the number of students in a self-contained classroom to about six. Id., p. 120. Burns described her 1:10 classroom environment as "pure chaos." Id., p. 171. Burns stated, "...we never really got past safety to get to the education... it's hard to educate a child when 100 percent of my brain power, all day, every day, is keeping everybody safe and calm and, you know, getting our basic needs met, is everybody changed, is everybody fed, ... do we have a high level of care. Id., p. 153.

Burns stated that she thought Student should have a one-on-one paraprofessional (Tr. Vol. I, pp. 58-59), yet Burns never requested one at an IEP meeting (Tr. Vol. I, p. 162). She described Student as being "very unsteady on her feet... she fell a lot." Burns wanted Student to stay in her activity chair for safety. Tr. Vol. I, pp. 105-106.

Burns also testified that Student had been pushed or hurt at school multiple times. Tr. Vol. I, p. 109. She relayed that Student lacks personal safety awareness and has poor balance, which is why she wears a helmet on the playground. On one day, Student was not wearing the helmet during physical education and fell flat on her face on the gym floor. Id., p. 107-108. The accident report stated that she was taken to the nurse crying, and had a "golf-ball sized knot" in the center of her forehead, "with start of some bruising." Tr. Vol. I, p. 224; Dist. Exh. 24, p. 2;

*See also* Parent Exh., pp. 517-523 for pictures. Burns stated that after that, she had Student wear the helmet indoors, not just on the playground, for her safety. Tr. Vol. I, p. 105.

The full-time classroom paraprofessional, Jalen Thomas, testified that JQ, one of the adult-sized fourth-grade boys in Student's self-contained classroom, "went for the more fragile kids," because he knew that would get a response. Tr. Vol. II, p. 160.  He also stated that JQ "has days when he attacks [Student]." Tr. Vol. II, p. 161.

### Incident of January 5, 2023

Thomas testified that on the morning of January 5, 2023, JQ had a behavioral outburst in which he threw a chair across the room during circle time. Tr. Vol. II, p. 103. Burns confirmed that JQ threw the chair over the heads of children sitting in the circle. Tr. Vol. I, p. 120. When JQ was being removed from the classroom, he hit and kicked Burns, and cursed her. Id. Burns left the classroom and went home after that, leaving the classroom without a teacher or substitute. Tr. Vol. I, p. 123. Principal New testified that the district did not try to find a substitute, and instead "looked at options within the building." Tr. Vol. I, p. 217. Thomas testified that on that same morning, JQ hit Student twice, hard, in the face. Tr. Vol. II, p. 161. JQ was removed from class, but later that morning, Assistant Principal Coatney returned JQ to the classroom, as provided in JQ's behavior plan. Tr. Vol. II, p. 262. Soon after JQ came back to the classroom, between recess and lunch, JQ kicked Student "in the lower leg." Tr. Vol. II, pp. 161-162. There were no other witnesses to the incident other than Thomas, and it was not reported to the school nurse. As a result, the school nurse did not examine Student, and no one contacted Parents. Nurse Mandy did note that in the afternoon Student was pulling at her sleeve. She checked her arm for signs of a problem, but finding none, determined there was nothing wrong. Tr. Vol. III, p. 54. Nurse

Mandy testified that Thomas changed Student's diaper that afternoon (Tr. Vol. III, p. 52), so she did not see any bruising on her legs or crotch area (Tr. Vol. III, pp. 18-19).

When Student arrived home from school that afternoon, she behaved as though she was in pain, and upon inspection Parents saw bruising in Student's inner thigh, crotch, and private parts, and began to believe she had been sexually assaulted. Tr. Vol. V, pp. 180-181. Parents then took Student to Arkansas Children's Hospital ("ACH") where she was examined and told that ACH believed she was sexually abused. Id. While the examining doctor ultimately concluded that there was not a sexual assault, she confirmed that Student had suffered a "vaginal injury" and bruising on her right knee and left surface of the pubic bone. Parents Exh., pp. 489-494. A Conway Police Department investigation into the resulting child maltreatment hotline report found no there was no information that two staff members interviewed were perpetrators of possible sexual abuse. Tr. Vol. V, pp. 10, 30; Parent Exh., p. 484.

The remainder of the evidence of what happened to Student on January 5 lies primarily in the category of what did not happen. No one other than Thomas testified that they witnessed Student being punched in the face or kicked. Even Burns stated that "there is no way for me to … tell you exactly who [JQ] hit" before she left the school that morning. Tr. Vol. I, p. 122. No one testified that they saw Student crying or in distress after being punched in the face or kicked. No one made a report to the nurse about Student being punched in the face or kicked. *See* Tr. Vol. III, p. 17. Nurse Mandy only noted that Student was pulling at her sleeve, and checked her arm for signs of a problem. School Principal Shanda New testified that her first discussion with Parents about the incident occurred by phone on February 2, 2024, almost one month later, at Parents' request. Tr. Vol. I, p. 190. No other District employee talked to Parents about Student being punched in the face or kicked. The IEP team did not discuss Student being punched in the

face or kicked on January 5, as Principal New told Mother that the IEP meeting "was not the appropriate forum for that." Tr. Vol. I, p. 227.

### 2/2/23 IEP Amendment:

On January 18, 2023, District received a letter from Dr. Eduardo Ochoa, Student's complex medicine physician, recommending that Student receive homebound education for the remainder of the school year, due to her medical condition and "a recent traumatic incident." Parent Exh., p. 47. On February 2, 2023, the IEP team met to discuss Dr. Ochoa's recommendation for homebound placement, and amended the IEP to provide Student four hours per week (240 minutes) of specialized instruction "in the areas of Math, Reading, Literacy, Daily Living, and Adaptive Behavior (Parent Exh., p. 50), instead of the 1,600 minutes per week she had been receiving in the self-contained classroom (Parents Exh., p. 9). Arkansas Children's Hospital was also represented at the meeting and requested, along with Mother, that the related services be provided privately. Tr. Vol. VI, p. 109. Therefore, the IEP no longer reflects any related services. Parent Exh., p. 50.

### 3/3/23 IEP Amendment

On March 3, 2023, the IEP team met again to review Student's homebound services. Parent Exh., p.58. The homebound teacher told the IEP team that "many of [Student]'s goals are difficult to achieve over a virtual format . . ." and that Student became fatigued after about 20 minutes of virtual instruction. Parent Exh., p. 50. Therefore, the IEP team amended the length of Student's sessions to 45 minutes. Id. This further reduced Student's specialized instruction from 240 minutes per week to 180 minutes per week. Parent Exh., p. 60. As a result, the IEP provided less than seven percent of her previous special education services.

**4/24/23 IEP Annual Review**

At the annual review of Student's IEP conducted on April 24, 2023, the IEP team noted that the team would meet again in August to determine if student is able to return to in-person instruction (on campus) based on information from her doctor. Parent Exh., p. 75. If Student returned to in-person instruction, she would again be placed in a 1:10 classroom. Id.

**C.  2023-2024 School Year (July 1, 2023, to August 28, 2023) – Second Grade**

At the beginning of the second grade, Parents began the process of enrolling Student in Compass Academy, a private school. Until her acceptance at Compass, Parents re-enrolled Student in District for in-person instruction for the second grade, this time at Ellen Smith Elementary. Tr. Vol. V, pp. 201-202. Kelli Gordon, District's Special Education Director, testified that the 1:10 classroom at Ellen Smith Elementary had an experienced special education teacher and that the other students were "at a similar level of need" as Student. Tr. Vol. VI, p. 125. Mother brought Student's activity chair and some personal care items to the school. Tr. Vol. V, pp. 201-202. Student missed the first week of school at District due to an illness. Tr. Vol. V, p. 205. District received a notice from Student's doctor on August 30, 2023, asking that her absences for the first week be excused. Tr. Vol. V, pp. 203, 206; District Exh. 32. Mother testified that she did not tell anyone at District that Parents were in the process of trying to enroll Student at Compass. Tr. Vol. V, p. 203.

On August 28, 2023, before Student could return to school, Parents filed the Complaint for Due Process, giving District written notice of Parents' intent to enroll Student in Compass. Complaint, p. 11. On September 18, 2023, Parents enrolled Student in Compass. Parents Post-

Hearing Brief, p. 15. As of September 18, 2023, the IEP team had not met again to discuss Student's return to in-person instruction.

Courtney Williams, Director, Compass Academy, testified that Compass opened in 2015 as a school choice option for students with disabilities. Tr. Vol. VI, p. 39. After a three-day trial at the school, Compass moved Student to a five-student classroom where occupational, physical, speech, and ABA therapists push in to provide services. Id., p. 42. The classroom has one teacher and one paraprofessional, so a 2:5 ratio. Compass uses a buddy system at recess and encourages social interaction with her classmates and other children at the school. Id. pp. 46-47. Compass works with Parents to promote consistency with what the school does for Student. Id., pp. 48-49. Students are grouped by age and ability, not necessarily by grade. Id., p. 52. Students that are higher functioning are sometimes moved around to provide a peer model experience, so that students can engage with peers other than their non-verbal classmates. Id. Student's goals at Compass include feeding and toilet training, interaction with peers and adults, attention to task, increased safety awareness, and ultimately self-sufficiency and independence. Id., p. 58. Compass charges nine thousand five hundred dollars ($9,500.00) for annual tuition, plus a one-time $200 new student enrollment fee and a $50 annual renewal fee. Id., p. 53. Parents may also apply for scholarships through the Department, which could potentially pay for all of Student's tuition, less the enrollment fee. Id.

## V.
## LAW AND DISCUSSION

The IDEA was enacted to ensure that all children with disabilities have available to them a free appropriate public education (a "FAPE") that emphasizes special education and related services designed to meet their unique needs....". 20 U.S.C. § 1400(d)(1)(A). A child is eligible

for special education and related services under the IDEA if: (a) the child has a disability; and (b) because of the disability needs special education and related services. Autism is among the disabilities contemplated by the IDEA (20 U.S.C. § 1401(3)), which defines it as:

> …a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age three, that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences. 34 CFR 300.8(c)(1); 20 U.S.C. 1401(9).

The first obligation of a school district is to identify, locate, and evaluate children with disabilities or children who are reasonably suspected of having disabilities regardless of their severity. 20 U.S.C. § 1412(a)(3) (emphasis added); 34 C.F.R. § 300.111; Rules of the Arkansas Dept. of Education, Special Education and Related Services, 3.0 Child Find, 3.01.1. After determining that a child is eligible under the IDEA because the child has a disability and, by reason thereof, needs special education and related services (20 U.S.C. § 1401(a)(3)), a school district team of professionals will develop and implement an IEP for the child that meets the requirements of state and federal law and regulations.

## A. Procedural Rights and Violations

Throughout the process of evaluating the child, developing an IEP, and implementing the IEP, eligible children and their parents are afforded specific procedural rights under the IDEA. The basic procedural rights include: (1) the opportunity for parents to examine all records relating to their child; (2) the opportunity for parents to attend meetings regarding identification, evaluation, and educational placement of their child, and the provision of a FAPE; (3) the opportunity to obtain an independent educational evaluation; (4) prior written notice of proposals

or refusals to initiate a change in the identification, evaluation, and educational placement of their child; and (5) the opportunity to present and resolve complaints. 20 U.S.C. § 1415(b)-(e).

Procedural inadequacies are violations if they:

- impede the child's right to a FAPE;
- significantly impede the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the parents' child; or
- cause a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

Parents did not raise any specific procedural violations in their due process complaint. It is, therefore, the conclusion of this Hearing Officer that District did not procedurally violate the IDEA.

## B. Substantive Violations

The failure of a school district to meet the requirements for a student's IEP is a substantive violation of the IDEA and a denial of FAPE. A district must develop a student's IEP pursuant to IDEA requirements, and be "reasonably calculated to enable the student to make appropriate progress in light of his specific circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 197, L. Ed. 2d 335 (2017). The IDEA requires every IEP to include the following: (1) a statement of a student's present levels of academic achievement and functional performance; (2) a description of how a student's disability affects his or her involvement and progress in the general education curriculum; (3) annual goals that are measurable, as well as a description as to how progress toward stated goals will be measured; and (4) a description of special education and related services to be provided to student. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV).

Student's IEPs for the 2022-2023 school year and the 2023-2024 school year, before amending for homebound services, considered the 1:10 classroom environment with older, larger

students, some of whom had aggressive maladaptive behaviors as an appropriate placement for Student. Student had been pushed, hit, and kicked by other students in this environment. Student was not adequately supervised in physical education and suffered an injury to her head. Rather than have the IEP team assess Student's placement, District staff instead determined that Student should stay in her activity chair and wear a helmet indoors at all times. Ultimately, Student suffered a "traumatic incident" that resulted in her being a homebound student. District did not even communicate to Parents about the January 5, 2024, incident, leaving Student's non-English speaking Parents to find bruising in Student's private area and fearing the worst - that someone had sexually abused their non-verbal special needs daughter. In fact, District prevented Parents from even discussing their safety concerns with the IEP team.

At Parents' request and in accordance with Student's doctor, District began providing Student's services under the IEP to Student at home. It was not reasonable for the IEP team to expect that this nonverbal child, who had difficulty with eye contact and responding to adults in person, would receive meaningful educational benefit under her existing IEP for homebound, virtual educational services. Although Parents requested that homebound services be provided virtually, the IEP team is ultimately responsible for the development and implementation of an IEP that meets the requirements of the IDEA. If the District and Parents do not agree as to placement, District may also file a request for a due process hearing. 34 CFR § 300.507; Ark. Dep't of Education Rules, Special Education and Related Services (February 9, 2024), Section 10.03.1.

District did not amend Student's IEP in anticipation of her return to in-person instruction. District did advise Parent that, for the second grade, Student would be placed in a different school (Ellen Smith Elementary), in a 1:10 self-contained classroom, with students "at a similar

level of need" as Student. District states in its Post-Hearing Brief (p. 6) that the classroom had one teacher and three paraprofessionals, but this information is not in evidence. There is otherwise no evidence that the IEP team has taken or will take sufficient steps to ensure Student's safety at school given her medically fragile condition. District did not offer any evidence that it intended anything other than to continue the first-grade practice of having Student stay in her activity chair and wear a helmet indoors at all times.

Therefore, this Hearing Officer finds that Student's IEPs for the 2022-2023 and 2023-2024 school years did not meet the substantive requirements of the IDEA, leading to a denial of a FAPE for Student.

## C. Unilateral Private School Placement by Parents

The IDEA requires Parents to provide written notice of their intent to place a student in a private school at public expense at least ten (10) business days prior to removing the child from public school. 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb). Here, Parents filed the Complaint on August 28, 2023, and enrolled Student in Compass Academy on September 18, 2023, giving District twenty-one days' written notice.

## D. Relief

A student is entitled to compensatory education and services to remedy any educational or other deficits that result from the denial of FAPE. *See School Comm. of Burlington v. Department of Education*, 471 U.S. 359, 374, (1985); *Parents of Student W. v. Puyallup School Dist., No. 3*, 31 F.3d 1489 (9th Cir. 1994) (ruling that "the hearing officer's ability to award relief [is] coextensive with that of the court..."(citing *Cocores v. Portsmouth, NH, School Dist.*, 779 F. Supp. 203 (D. N.H. 1991)). Compensatory education awards "should aim to place disabled

children in the same position they would have occupied but for the school district's violations of IDEA." *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 518 (D.C. Cir. 2005).

The U.S. Supreme Court held that private school tuition reimbursement is an allowable remedy under the IDEA because "[r]eimbursement merely requires the [public agency] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Burlington*, at 371. Following its decision in *Burlington*, the Court held in 2009 that private school tuition is an appropriate remedy, as long as the public agency violated the IDEA and the private school placement is proper under the Act. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246 (2009).

As previously stated, this Hearing Officer finds that Parents have met the burden of proving that the public agency violated the IDEA and denied Student a FAPE by failing to develop IEPS for the 2022-2023 and 2023-2024 school years that meet the substantive requirements of the IDEA.

This Hearing Officer determines that Compass Academy is an appropriate placement for Student, given the severity of her special needs. Compass will provide a much smaller, and safer, classroom environment for learning and social interaction, with push-in services for occupational, physical, and speech therapies. Additionally, Compass communicates regularly with Parents and will be working with Parents to ensure consistency with school programming efforts at home. Parents have one or more scholarships available for tuition assistance, and District should pay the remainder of the cost of tuition and provide transportation or reimburse Parents for the cost of transportation they provide.

## VI.
## ORDER

Therefore, after the consideration of the evidence, testimony, and arguments of counsel, it is determined that District failed to provide Student a FAPE during the 2022-2023 and 2023-2024 school years, and that Compass Academy is an appropriate placement for Student. District is **ORDERED** to pay the balance of tuition, fees, and costs, after the deduction of any scholarship funds, and the cost of transportation to and from the school, for Student to attend Compass Academy from and after the date of Student's enrollment at Compass on September 18, 2023. Parents are **ORDERED** to cooperate with requests from District concerning the annual amount of scholarship funds that Parents receive.

**IT IS FURTHER ORDERED** that Parents' claims filed under Title II of the Americans with Disabilities Act, and § 504 of the Rehabilitation Act of 1973, and racial/national origin discrimination in violation of the Civil Rights Act of 1964, as amended (42 U.S.C. §2000d), are hereby **DISMISSED WITHOUT PREJUDICE.**

## VII.
## FINALITY OF ORDER AND RIGHT TO APPEAL

The decision of this Hearing Officer is final. A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's decision is filed with the Department. 34 C.F.R. §300.516.

Pursuant to Section 10.20.9, Ark. Dep't of Education Rules, Special Education and Related Services (February 9, 2024), the Hearing Officer has no further jurisdiction over the parties to the hearing.

**IT IS SO ORDERED.**

/s/ *Cheryl L. Reinhart*
**Cheryl L. Reinhart**
**Hearing Officer**

**June 22, 2024**